# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| NIBERLEY WALTON, Petitioner, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | No. 20-791V<br>Special Master Christian J. Moran<br><br>Filed: September 28, 2026 |

Mark Theodore Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner; Madelyn Weeks, United States Dep't of Justice, Washington, D.C., for respondent.

**PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS**[1]

Petitioner, Niberley Walton, alleged that a tetanus, diphtheria, and acellular pertussis ("Tdap") vaccine she received caused her to suffer from "vaccine-induce neuropathy, including small fiber neuropathy, and fibromyalgia." She did not receive compensation.

Ms. Walton requests an award of her attorneys' fees and costs. A reasonable amount is $49,440.90.

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

# I. Procedural History

## A. Activities before the Petition Was Filed

Ms. Walton consulted the attorney who represented her, Mark Sadaka, on April 5, 2019.[2] Over the course of the next approximately 14 months, a paralegal collected and reviewed medical records.

## B. Petition and Activities before Expert Reports

Ms. Walton filed her petition on June 29, 2020, alleging that the Tdap vaccine she received on December 4, 2018 caused or significantly aggravated her small fiber neuropathy and fibromyalgia. As Ms. Walton gathered more medical records, the case stayed in Pre-Assignment Review for approximately one more year.

After Ms. Walton fulfilled her obligation to present medical records, the case was assigned to the undersigned. An order regarding attorneys' fees was issued.

The Secretary reviewed the material and recommended against an award of compensation. The Secretary argued that Ms. Walton had not put forth a medical theory to support an onset of small fiber neuropathy or fibromyalgia within 24 hours. Resp't's Rep. at 13. The Secretary also argued that the records do not show that Ms. Walton's condition worsened as a result of her vaccination, nor that she suffered from small fiber neuropathy or fibromyalgia prior to her vaccination. Id. at 15.

## C. Expert Reports

### 1. First Round

The case then moved to the expert stage. See Order, issued Nov. 9, 2021 (proposing draft instructions). Ms. Walton obtained a report from an expert slowly.

From October 2021 through February 2022, Mr. Sadaka and his paralegal attempted to retain an expert.[3] Although Ms. Walton remained obligated to present a report from an expert, neither Mr. Sadaka nor his paralegal has recorded any time searching for an expert in March or April 2022.

At the end of June 2022, Mr. Sadaka discussed the case with a rheumatologist who has often supported claims that a vaccination harmed someone, David Axelrod. Ms. Walton submitted her report from Dr. Axelrod on August 8, 2022. Exhibit 9. Dr. Axelrod opined that Ms. Walton suffered from both small fiber neuropathy and fibromyalgia, but recognized that, as he is not a neurologist, he could not comment further about small fiber neuropathy. Id. at 5. To

---

[2] Information about the activities of the legal professionals is found in the timesheets, which are Exhibit A to the petitioner's motion for attorneys' fees and costs.

[3] Mr. Sadaka's time entries would benefit from more specificity. For example, on December 28, 2021, Mr. Sadaka has charged 1.3 hours for "Research additional experts for case." It would be helpful to know how (or where) Mr. Sadaka is looking for experts.

explain how the Tdap vaccination could cause these conditions, Dr. Axelrod proposed a theory involving the innate immune system (meaning cytokines) and a theory involving molecular mimicry. Dr. Axelrod also asserted that Ms. Walton developed her problems within 24 hours of the vaccination and this period was one from which an inference of causation is appropriate. For this report, Dr. Axelrod has requested compensation at a rate of $400 per hour for 9 hours. Pet'r's Mot. for Attorneys' Fees, Appendix B, at pdf 15 (invoice dated Aug. 2, 2022).

The Secretary filed reports from a neurologist, Dr. Lancaster, and an immunologist, Dr. Schroeder, on January 30, 2023. Dr. Lancaster stated that Ms. Walton "may have a mild degree of small fiber neuropathy," but that it would not account for many of her symptoms. Exhibit A at 16. He saw no evidence that the small fiber neuropathy was caused by the vaccine. In this context, Dr. Lancaster challenged Dr. Axelrod's opinion regarding molecular mimicry. Dr. Lancaster asserted that the antibodies that Dr. Axelrod had implicated as causing Ms. Walton's diseases were actually involved in different diseases, and stated that the "very rapid onset and progression of symptoms weighs against a causal link." Id. Dr. Schroeder noted that Ms. Walton's treating doctors generally agreed upon a diagnosis of fibromyalgia, but the small fiber neuropathy diagnosis was "on softer ground due to the borderline results from the skin biopsies." Exhibit C at 7. He emphasized that "there is no evidence that fibromyalgia is an inflammatory/autoimmune disorder." Id. at 13.

2. Initial Special Master Review

A status conference was held on March 21, 2023. The undersigned stated that the Secretary had presented a strong case against entitlement. The stronger evidence for diagnosis supported fibromyalgia, not small fiber neuropathy. Ms. Walton had presented no evidence that an increase in cytokines causes harmful effects. Ms. Walton was given an opportunity to file a supplemental report from Dr. Axelrod addressing how cytokines cause harmful effects. See Order, issued Mar. 23, 2023.

3. Second Round of Expert Reports

Ms. Walton filed a second expert report from Dr. Axelrod on July 21, 2023. Exhibit 36. Dr. Axelrod conceded that fibromyalgia is not considered to be an autoimmune disease. Nevertheless, he seemed to propose that the Tdap vaccination still caused Ms. Walton to suffer fibromyalgia in a convoluted way that is difficult to summarize. Dr. Axelrod also agreed that an onset of 48 hours is too fast for an adaptive immune response. In doing so, Dr. Axelrod effectively removed molecular mimicry as a viable theory to explain how the Tdap vaccination could cause Ms. Walton to suffer an autoimmune problem in approximately 48 hours. Dr. Axelrod maintained that an increase in cytokines could cause the development of fibromyalgia within this short time without explaining how that would happen. For this report, Dr. Axelrod has charged 10.5 hours at a rate of $400.00 per hour. Pet'r's Mot. for Attorneys' Fees, Appendix B, at pdf 16 (invoice dated June 13, 2023).

The Secretary's experts disputed that a rise in cytokines can cause fibromyalgia or small fiber neuropathy. Exhibit E at 2-3; Exhibit F at 5.

4. Second Special Master Review

A November 20, 2023 order highlighted the deficiencies in Ms. Walton's case. The undersigned noted that it was unsettled whether petitioner suffered from any degree of small fiber neuropathy. Even assuming Ms. Walton suffered from fibromyalgia, it is not considered an autoimmune disease, making it difficult to understand how a vaccine might cause the condition. The undersigned stated that Dr. Axelrod asserted a theory involving cytokines, but had not explained it persuasively. Ms. Walton was given a "final opportunity to present a supplemental report from Dr. Axelrod."

After the November 20, 2023 order, there is no indication on the attorney timesheets that Mr. Sadaka or his paralegal communicated with Dr. Axelrod until January 31, 2024. However, via a motion for enlargement of time filed on December 20, 2023, Mr. Sadaka stated that he had spoken with the expert, who needed more time.

On February 2, 2024, Ms. Walton filed another motion for enlargement of time. In this motion, Mr. Sadaka stated that he had not been able to speak with his client about information Dr. Axelrod needed to move the case forward. However, Mr. Sadaka and his paralegal had communicated with Ms. Walton on December 21, 2023. Moreover, as discussed below, it is not readily apparent why Dr. Axelrod needed information from Ms. Walton. Regardless, Ms. Walton's February 2, 2024 motion was deferred until a status conference was held.

Between the date a ruling on the motion for enlargement of time was deferred and the status conference, Mr. Sadaka spoke to Ms. Walton about an "expert report and recent court orders." Entry for Feb. 16, 2024. However, no time entry shows that Mr. Sadaka or his paralegal communicated with Dr. Axelrod from February 2, 2024 until February 29, 2024.

In the February 29, 2024 status conference, Mr. Sadaka stated that he had spoken with petitioner. (This aspect appears accurate.) Mr. Sadaka also stated that Dr. Axelrod "will be able to solve the problems in the case." Order, issued Mar. 1, 2024. When Dr. Axelrod communicated this position to Mr. Sadaka is not readily apparent.

5. Third Report from Dr. Axelrod

Ms. Walton filed her third report from Dr. Axelrod on April 1, 2024. Exhibit 54. This report is very similar to his second report. The third report begins from a summary of four articles discussing targets for the development fibromyalgia, a potential role of the immune system in fibromyalgia, and a possible autoimmune etiology of fibromyalgia. As to the remainder of the third report, the vast majority appears to have been copied and pasted from the second report. Ms. Walton has not submitted an invoice for Dr. Axelrod for in preparing his third report.

6. Order to Show Cause

An Order to Show Cause issued on May 13, 2024. The order advised Ms. Walton that she had not carried her burden of presenting a minimally persuasive case that the Tdap vaccine caused her injury. In particular, she had not established that she suffered from small fiber neuropathy. Furthermore, her more likely injury of fibromyalgia is not considered an autoimmune disease, making it unlikely to have been caused by a vaccine. Although Dr.

Axelrod argued that the classification of fibromyalgia continues to change, Ms. Walton had not presented preponderant evidence that fibromyalgia is autoimmune in nature. Ms. Walton was directed to explain why her case should not be dismissed for a failure to present persuasive evidence with an expert report and/or arguments from counsel.

7. Report from a New Expert and Final Reports from The Secretary's Experts

In response, Ms. Walton submitted a report from a neurologist, Dr. Jeret. Exhibit 56. Ms. Walton stated that Dr. Jeret "confirms her diagnosis, including small fiber neuropathy . . . [which] is known within the program to be an autoimmune condition and has been previously linked to vaccinations." Pet'r's Resp. to Order to Show Cause, filed July 19, 2024.

Dr. Jeret explained that symptoms of small fiber neuropathy "vary widely in features and severity," and highlighted how petitioner satisfies the Freeman criteria. Exhibit 56 at 10-11. He contended that "the prevalence of SFN is probably highly underestimated due to lack of a gold standard for diagnosis and lack of awareness among clinicians." Id. at 12. Dr. Jeret also argued that "Recent data has indicated that FM has an immune base," describing it an "an emerging field," and citing the study by Goebel which Dr. Axelrod referenced. Id.

As to timing, Dr. Jeret stated that it is possible for autoimmune reactions to occur within one day, citing examples in Pan (four cases of GBS within one day of DTaP) and Agmon-Levin (one case of fibromyalgia within one day of hepatitis B vaccination). Exhibit 56 at 13. He also explained that "it is accepted that patients with one autoimmune process are at higher risk for additional autoimmune processes. Ms. Walton had a history of optic neuritis, which Dr. Jeret described as "typically autoimmune," and HELLP syndrome, which he stated "is thought to be an inflammatory disorder mediated by a complement cascade." Id. Dr. Jeret also mentioned that Ms. Walton's parents both had autoimmune diseases and that these are often hereditary. "To postulate an autoimmune reaction to a vaccine in such an individual who was 'primed' for a[n] autoimmune event is quite reasonable." Id.

In response to Dr. Axelrod and Dr. Jeret's reports, the Secretary submitted supplemental reports from Dr. Lancaster and Dr. Schroder. Addressing Dr. Axelrod's report, Dr. Lancaster disputed the idea that fibromyalgia is an autoimmune disease. Exhibit F (ECF No. 88-1)[4] at 1-3. He described Dr. Axelrod's theories regarding LGI1 and NMDAR antibodies as unsupported by literature and noted that Ms. Walton did not have symptoms associated with these antibodies. Id. at 3. Dr. Lancaster also noted that Dr. Axelrod "discusses homology but does not define any specific mimic substance in the vaccine and does not specify what single antigen in Petitioner's body this triggered an immune response against." Id. He maintained that the onset of Ms. Walton's symptoms was "too fast for an antibody mechanism, and it is also too fast for a specific T cell mediated immune response." Id.

Dr. Lancaster criticized the Goebel paper cited by both Dr. Axelrod and Dr. Jeret. He referenced his previous report, in which he noted "important limitations" to this "single study."

[4] There are two exhibits labeled as Exhibit F. All references to Exhibit F in this decision refer to ECF No. 88-1.

Dr. Lancaster explained that animal behaviors cannot be considered the same as fibromyalgia; the changes were modest and it would be an overstatement to say the animals had fibromyalgia; some experiments were done with pooled antibodies from multiple patients, making it unclear how many patients actually were responsible for the effect; and that there is "no definite proof of specific antibody . . . being found in patients with fibromyalgia. Exhibit F at 1-2.

Dr. Lancaster also addressed the Agmon-Levin paper. He characterized the finding that onset ranged from one day to one year as "implausible on both ends, since an autoimmune disease . . . would be unlikely to damage the nervous system to cause chronic pain within 1 day." Exhibit F at 4. Further, he stated that the authors "seem to have a very expansive view of causation in attributing any disease within a year of vaccination to the vaccination. This range is far outside the usual bounds of vaccine-induced autoimmune disorders." Id. In all, he opined that the Agmon-Levin paper "does not provide reliable evidence that vaccination causes either chronic fatigue syndrome of fibromyalgia." Id.

As with Dr. Axelrod's theory, Dr. Lancaster criticized Dr. Jeret's theory for lack of detail about how a vaccine could cause fibromyalgia through an autoimmune mechanism within one day. Id. In his conclusion, he maintained that Ms. Walton was unlikely to have suffered from small fiber neuropathy, and that it would not account for all her symptoms. Furthermore, he stated the very rapid onset and progression of symptoms weighed against vaccine causation; and that Ms. Walton's expert's theories were unlikely to be true. Id. at 5. Specifically, he argued that Dr. Axelrod's theories "invoked autoimmune processes that have not been shown to occur, or autoimmune diseases that Petitioner very likely did not have," and that homology is not a reliable method to predict autoimmune disease post-vaccination. He refuted Dr. Jeret's theories by noting that fibromyalgia is not treated as an autoimmune disease by the medical community. Id.

Dr. Schroder also responded to Ms. Walton's experts' reports. Exhibit G. Expanding upon Dr. Jeret's comment about how reliance on subjective complaints makes diagnosing fibromyalgia and small fiber neuropathy difficult, Dr. Schroder noted that this also makes mechanistic study difficult. Id. at 1-2. Dr. Schroder further argued that the onset of Ms. Walton's symptoms occurred too soon after her Tdap vaccination to be attributable to an adaptive immune response to the vaccine. Id. at 2. He explained the timeline of an adaptive immune response, stating it follows "a predictable pattern" wherein it ultimately takes five to seven days before anti-antigen activity becomes apparent, with a peak response occurring around fourteen days after the antigen activation. Id. at 3. Dr. Schroder disputed that the Tdap vaccine could cause fibromyalgia via molecular mimicry, noting the "widespread and prolonged" exposure to self-antigen molecular mimics. Id. at 4. He further noted that Dr. Axelrod acknowledged the commonality of molecular mimicry despite the infrequency of autoimmune disease. Id. at 5.

Ms. Walton was invited to submit additional expert reports. Order, issued Dec. 6, 2024. In response, Ms. Walton stated that the parties had already exchanged reports, and requested a Rule 5 conference to discuss next steps. Pet'r's Status Rep., filed Feb. 6, 2025.

8. Third Assessment by Special Master

To provide guidance and discuss outstanding issues, the undersigned issued an order again explaining the deficiencies in Ms. Walton's case. Order, issued April 3, 2025.

> A few issues remain prominent in petitioner's case. The first issue is diagnosis. It appears unlikely that petitioner has small fiber neuropathy. Dr. Lancaster commented that "It is unclear from Dr. Axelrod's report whether he believes that petitioner suffers from small fiber neuropathy," and petitioner did not submit a report from Dr. Axelrod to respond. Exhibit F at 2. Although Dr. Jeret explains how petitioner might meet the criteria for a diagnosis of small fiber neuropathy, he does not address Dr. Lancaster's point that several of petitioner's symptoms cannot be explained by small fiber neuropathy. Dr. Schroder noted that, as Dr. Jeret also acknowledged, the diagnoses of both small fiber neuropathy and fibromyalgia rely on subjective complaints. This makes it difficult to quantify and to study the conditions. Exhibit G at 1-2.
>
> The next issue relates to theory. Beyond stating that science and research is evolving, petitioner's experts do not dispute that fibromyalgia is still predominantly regarded as a non-autoimmune disease. Without this showing, petitioner's theory of molecular mimicry cannot adequately explain how a vaccine would cause her condition. Moreover, petitioner's theory of molecular mimicry is too vague to this carry her burden under Althen. As Dr. Lancaster describes, petitioner's theory of molecular mimicry is "unclear" and does not identify which components would have interacted to trigger an autoimmune response. Exhibit F at 3. "The finding of sequence homology does not necessarily mean the similarity has significance to the immune system." Tullio v. Sec'y of Health & Hum. Servs., No. 15-51V, 2019 WL 7580149, at *15 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), rev. granted, decision aff'd, 149 Fed. Cl. 448 (2020). To prevail on a theory of molecular mimicry, a petitioner must "offer reliable and persuasive medical or scientific evidence of some kind (whether expert testimony or literature) that suggests the vaccine components could interact with the self structures as maintained." Johnson v. Sec'y of Health & Hum. Servs., No. 14-254V, 2018 WL 2051760, at *26 (Fed. Cl. Spec. Mstr. Mar. 23, 2018).
>
> Finally, assuming that petitioner does have an autoimmune condition, petitioner's experts do not persuasively explain how an autoimmune response may occur within 24 to 48 hours. Dr. Jeret cites to the Pan and Agmon-Levin papers, which described cases with an onset of one day. However, these papers do not discuss a Tdap vaccine resulting in fibromyalgia. Agmon-Levin suggested that the subjects' chronic fatigue syndrome and fibromyalgia "can

> be temporally related to immunization, as part of ASIA syndrome," which stands for autoimmune (anti-inflammatory) syndromes induced by adjuvants. Agmon-Levin at 1. The ASIA theory has not been found to be a credible theory under the first Althen prong. See D'Angiolini v. Sec'y of Health & Hum. Servs., 122 Fed. Cl. 86, 101 (2015), aff'd, 645 F. App'x 1002 (Fed. Cir. 2016) (upholding special master's determination that the ASIA condition did not provide a reliable theory for recovery); see also Trollinger v. Sec'y of Health & Hum. Servs., No. 16-473V, 2023 WL 2521912, at *10 n.20 (Fed. Cl. Spec. Mstr. Feb. 17, 2023), mot. for review denied, 167 Fed. Cl. 127 (2023) (listing cases in which special masters rejected the ASIA theory). The Pan paper does not propose a mechanism by which onset of an autoimmune injury would occur so rapidly, and concludes that "the causal relationship between [vaccination and GBS] are worthy [of] further exploration." Pan at 1. Respondent's experts persuasively explained the necessary timeline for the onset of an autoimmune response and maintained their opinions that petitioner's onset was too rapid to be attributed to the vaccine. In the absence of an explanation as to how her onset might have occurred so quickly, petitioner has not met her burden under prong two either.

Ms. Walton was given an opportunity to consider whether it was reasonable to continue to pursue her case.

9. Resolution of Entitlement

Ms. Walton filed a status report on May 5, 2025, stating that she had met with counsel several times to discuss the order and research that she had done. Ms. Walton wanted to seek a second legal opinion, and requested additional time to determine her course of action. On June 6, 2025, Ms. Walton filed a status report stating that she had "decided to withdraw her case and will be filing a motion to dismiss shortly." Ms. Walton filed her motion to dismiss on July 24, 2025.

Ms. Walton was found not entitled to compensation. The reports from her experts were not persuasive. The decision, filed July 30, 2025, summarized:

> As explained in the November 20, 2023; May 13, 2024; and April 3, 2025, orders, it appears more likely that Ms. Walton suffers from fibromyalgia than small fiber neuropathy. Beyond stating that science and research is evolving, Ms. Walton's experts do not dispute that fibromyalgia is still predominantly regarded as a non-autoimmune disease. Without this showing, Ms. Walton's theory of molecular mimicry cannot adequately explain how a vaccine would cause her condition. Moreover, Ms. Walton's theory of molecular mimicry is too vague to this carry her burden under Althen. As Dr. Lancaster describes, Ms. Walton's theory of molecular mimicry is "unclear" and does not identify which

> components of the immune system would have interacted with some other host tissue to trigger an autoimmune response. Exhibit F at 3. To prevail on a theory of molecular mimicry, a petitioner must "offer reliable and persuasive medical or scientific evidence of some kind (whether expert testimony or literature) that suggests the vaccine components could interact with the self structures as maintained." Johnson v. Sec'y of Health & Hum. Servs., No. 14-254V, 2018 WL 2051760, at *26 (Fed. Cl. Spec. Mstr. Mar. 23, 2018); see also Tullio v. Sec'y of Health & Hum. Servs., No. 15-51V, 2019 WL 7580149, at *15 (Fed. Cl. Spec. Mstr. Dec. 19, 2019), mot. for rev. denied, 149 Fed. Cl. 448 (2020) (finding that the theory of molecular mimicry was unpersuasive even when sequence homology was identified).
>
> Furthermore, even assuming that Ms. Walton does have an autoimmune condition, her experts do not persuasively explain how an autoimmune response may occur within 24 to 48 hours. Special masters have previously found that vaccines do not cause autoimmune conditions [quickly]. See, e.g., Henry v. Sec'y of Health & Hum. Servs., No. 17-721V, 2022 WL 2301321, at *35-36 (Fed. Cl. Spec. Mstr. May 2, 2022) (finding 20 hours too quickly because, in part, Dr. Gershwin stated that 24-48 hours is needed for a significant IgM response); O.M.V. v. Sec'y of Health & Hum. Servs., No. 16-1505V, 2021 WL 3183719, at *47 (Fed. Cl. Spec. Mstr. June 16, 2021) (finding that an innate immune response cannot cause a demyelinating condition in 24 hours), mot. for rev. denied on unrelated ground, 157 Fed. Cl. 376 (2021); Samuels v. Sec'y of Health & Hum. Servs., No. 17-071V, 2020 WL 2954953, at *20-21 (Fed. Cl. Spec. Mstr. May 1, 2020) (finding that petitioner had failed to establish proinflammatory cytokines could cause demyelinating injuries within 24 hours); Parker v. Sec'y of Health & Hum. Servs., No. 14-979V, 2019 WL 3425297 at *28-29 (Fed. Cl. Spec. Mstr. June 24, 2019) (finding 24 hours is an insufficient time for molecular mimicry). Ms. Walton has therefore not met her burden under Althen.

This decision concluded the phase of Ms. Walton's case.

### D. Attorneys' Fees and Costs

Now, Ms. Walton requests an award of her reasonable attorneys' fees and costs. Pet'r's Mot., filed Oct. 31, 2025. She argues that her case was supported by reasonable basis and good faith. She requests a total of $64,515.50, consisting of $51,164.00 in attorneys' fees and $13,351.50 in attorneys' costs.

The Secretary presented what might be a hybrid response. As typical, the Secretary deferred to the (undersigned) special master's assessment regarding reasonable basis and the amount to be awarded in attorneys' fees and costs. Yet, the Secretary also presented a lengthy

footnote setting forth the standards by which reasonable basis is evaluated without addressing the evidence. See Resp't's Resp., filed Nov. 14, 2025, at 3 n.2. Similarly, in another lengthy footnote, the Secretary seemed to suggest that resources on this case may have been spent unreasonably. Id. at 1 n.1. In this context, the Secretary also pointed out that Dr. Jeret's invoice did not document his time. The Secretary is reminded that arguments presented in footnotes are generally frowned upon. SmithKline Beecham, Corp. v. Apotex Corp., 439 F.3d 1312, 1320 (Fed. Cir. 2006) (explains an argument needs to be developed, not just in footnote).

Ms. Walton defended her fee application by writing two sentences. Pet'r's Reply, filed Nov. 18, 2025. With the submission of the reply, the motion is ready for adjudication.

## II. Eligibility for Attorneys' Fees and Costs

Even though compensation was denied, a petitioner who brings a petition in good faith and who has a reasonable basis for the petition may be awarded attorneys' fees and costs. See 42 U.S.C. § 300aa–15(e)(1). Here, the reports from Dr. Axelrod carry Ms. Walton over the low bar for finding reasonable basis.

Furthermore, even if a petitioner were found to possess a reasonable basis for her claim (at any point), a special master retains the discretion to deny attorneys' fees and costs. James Cornelius v. Sec'y of Health and Hum. Servs., 984 F.3d 1374, 1379 (Fed. Cir. 2021). But, Ms. Walton's case does not exhibit any special circumstances that warrant a *complete* denial of attorneys' fees and costs. Thus, she will be awarded her reasonable attorneys' fees and costs.

## III. Reasonable Amount of Attorneys' Fees and Costs

### A. Standards for Adjudication

Under the Vaccine Act, a special master may award reasonable attorneys' fees and costs. 42 U.S.C. § 300aa-15(e)(1). Reasonable attorneys' fees are calculated by multiplying a reasonable hourly rate by a reasonable number of hours expended on litigation, the lodestar approach. Avera, 515 F.3d at 1347–48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)); Saxton v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993). In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness. See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018).

Special masters have "wide latitude in determining the reasonableness of both attorneys' fees and costs." Hines v. Sec'y of Health & Human Servs., 22 Cl. Ct. 750, 753 (1991). They may look to their experience and judgement to reduce the number of hours billed to a level they find reasonable for the work performed. Saxton ex rel. v. Sec'y of Health & Human Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).

Petitioners "bear[] the burden of establishing the hours expended, the rates charged, and the expenses incurred." Wasson v. Sec'y of Health & Human Servs., 24 Cl.Ct. 482, 484 (1991), aff'd in relevant part, 988 F.2d 131 (Fed. Cir. 1993). Adequate proof of the claimed fees and costs should be presented when the motion is filed. Id. at 484 n.1. Counsel "should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise

unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." Hensley v. Eckerhart, 461 U.S. 424, 434 (1983).

## B. Attorneys' Fees

Fee adjudicators may reduce amounts requested in attorneys' fees with a percentage reduction. See, e.g., Westdale Northwest Ctr. v. United States, No. 16-113, 2022 WL 1656718, at *12 (Fed. Cl. May 25, 2022) (reducing fees by 25 percent for lack of success on core claims); Yang v. United States, 156 Fed. Cl. 1, 8 (2021) (reducing total hours from 406.4 by 201.65, slightly over a 50 percent reduction in fees, for unproductive work); Greenhill v. United States, 96 Fed. Cl. 771, 780, 785 (2011) (reducing EAJA fee award by 60 percent for duplicative and excessive billing and limited success); Town of Grantwood Village v. United States, 55 Fed. Cl. 481, 489 (2003) (reduction of 30 percent for supplemental fee petition); Presault v. United States, 52 Fed. Cl. 667, 681 (2002) (reduction of 20 percent of the total requested fee); KMS Fusion, Inc. v. United States, 39 Fed. Cl. 593, 603 (1997) (reducing fee award to 40 percent of requested attorneys' fees for vagueness); Cf. FastShip, LLC v. United States, 143 Fed. Cl. 700, 733 (2019) (reducing a damages expert fees by 85%), vacated on other grounds, 968 F.3d 1335 (Fed. Cir. 2020), reinstated after remand, 153 Fed. Cl. 215, 232-33 (2021), app. dismissed, No. 2021-2031, 2021 WL 2413188 (Fed. Cir. June 10, 2021).

Special masters have previously reduced fees by 20 percent without conducting a line-by-line analysis. See Mack v. Sec'y of Health & Hum. Servs., No. 15-0149V, 2017 WL 5108680, at *4-6 (Fed. Cl. Spec. Mstr. Sept. 28, 2017) (reducing fees by 20 percent for vagueness, impermissible entries, and excessive and duplicative billing without conducting a line-by-line evaluation); Boman v. Sec'y of Health & Hum. Servs., No. 15-0256V, 2017 WL 7362539, *4-6 (Fed. Cl. Spec. Mstr. Sept. 20, 2017) (reducing fees by 20 percent for vagueness and overbilling); Willett v. Sec'y of Health & Hum. Servs., No. 15-252V, 2017 WL 3298983, at *4 (Fed. Cl. Spec. Mstr. June 2, 2017) (reducing fees by 20 percent for vagueness); Raymo v. Sec'y of Health & Hum. Servs., No. 11-654V, 2016 WL 7212323, at *18 (Fed. Cl. Spec. Mstr. Nov. 2, 2016) (reducing fees by 20 percent for excessive and duplicative billing); see also Marshall v. Sec'y of Health & Hum. Servs., No. 14-491V, 2017 WL 6763068, *4 (Fed. Cl. Spec. Mstr. Dec. 7, 2017) (reducing fees by 25 percent for vagueness and excessive and duplicative billing); Helton v. Sec'y of Health & Hum. Servs., No. 16-0234V, 2017 WL 4020452, at *5-6 (Fed. Cl. Spec. Mstr. Aug. 28, 2017) (reducing fees by 25 percent for excessive billing). The fees awarded to Mr. Sadaka have been reduced using a percentage reduction. Brown v. Sec'y of Health & Hum. Servs., No. 14-235V, 2018 WL 818231, at *4 (Fed. Cl. Jan. 18, 2018) (reducing attorneys' fees by 10 percent to account for "the volume of duplicative, excessive, and block billing entries").

The undersigned's "overall sense of the suit," Fox v. Vice, 563 U.S. 826, 838 (2011), shows that the amount requested in attorneys' fees is unreasonable. Some examples of excessively charged work include individually billing for reviewing routine CM/ECF notices issued the same day and minute entries for status conferences that Mr. Sadaka attended. E.g. entries for June 30, 2020; July 27, 2021; Nov. 9, 2021; Jan. 10, 2022; Mar. 21, 2023; Nov. 20, 2023; Feb. 29, 2024. Another recuring issue is the paralegal charged for performing routine clerical work for which an attorney should not charge. E.g. entries for July 10, 2020; Jan. 8, 2021; July 14, 2021; July 19, 2021; Nov. 29, 2022; July 20, 2023; July 21; 2023; Apr. 1, 2024; Aug. 7, 2024. Sometimes work was duplicated, resulting in overcharges. E.g. Entries for

Feb.24, 2021; Mar. 1, 2021; Feb. 1, 2022; Feb. 10, 2022; Mar. 11, 2022; May 23, 2024; May 28, 2024.

A recurring issue is the amount of time spent conferring with the law firm's client. For example, after the Secretary contested entitlement due in part to the lack of an expert, Ms. Walton was ordered to obtain a report from an expert. Mr. Sadaka communicated with Ms. Walton about the next steps. Entry for Nov. 10, 2021. This step is reasonable. However, Mr. Sadaka has charged 1.0 for this task. It is difficult to understand how a communication saying something like "we are required to get a report from an expert" can take 60 minutes. For other examples, see entries for Oct. 6, 2022; Dec. 13, 2022. During the expert phase, Mr. Sadaka or his paralegal often conferred with Ms. Walton. E.g. entries for June 26, 2023; July 18, 2023; Dec. 21, 2023; Feb. 16, 2024; Apr. 5, 2024; July 15, 2024; Nov. 4, 2024. Again, the issue is not so much with the fact of the communication as the concern is with the duration. The problems Dr. Axelrod faced, such as the need to present a theory that accounts for an onset of symptoms within 24 hours, is a problem of medical science for which a doctor's expertise is expected. Ms. Walton is not likely to be the person to solve this issue.

Finally, the undersigned is concerned that the case's duration was drawn out excessively. Mr. Sadaka did not obtain reports from experts promptly. This delay was for a variety of reasons, including that Mr. Sadaka, apparently, did not pursue a report consistently or quickly. Mr. Sadaka, then, filed (and charged for) motions for enlargement of time. Experienced attorneys, like Mr. Sadaka, who charge relatively high hourly rates should be able to prosecute cases more quickly.

Accordingly, for these reasons, the amount of attorneys' fees is reduced by 15 percent. This results in an award of $43,489.40.

### C. Attorneys' Costs

Ms. Walton has requested $13,351.50 in costs. Several items are for routine matters such as a charge for mailing, the charge for obtaining medical records, and the filing fee. These are adequately documented, reasonable, and awarded in full.

Ms. Walton has also requested $100 for an "administrative fee." This item is not otherwise explained. To the extent that Mr. Sadaka is attempting to remedy a problem in which the payment of attorneys' fees and costs has been delayed, see Pet'r's Mot. at 5, charging interest is not allowed.[5] See Kleva v. Sec'y of Health & Human Servs., No. 17-749V, 2019 WL 2156432, at *2 (Fed. Cl. Spec. Mstr. Mar. 18, 2019); Kollias v. Sec'y of Health & Human Servs., No. 16-868V, 2018 WL 6301793, at *3 (Fed. Cl. Spec. Mstr. Oct. 2, 2018); Jeffries v. Sec'y of Health & Human Servs., No. 99-0670V, 2006 WL 3903710, at *18 (Fed. Cl. Spec. Mstr. Dec.

[5] The process for paying attorneys' fees *is* taking longer. One reason is that special masters are required to evaluate the reasonableness of fee applications even when the Secretary has not interposed an objection. McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018). Another reason is that some petitioners pursue weakly supported claims, which consume judicial resources that could have been otherwise spent on determining the reasonableness of attorneys' fees and costs.

15, 2006) (citing Library of Congress v. Shaw, 478 U.S. 310, 317 (1986) (finding that finance charges on an outstanding bill incurred by petitioner amounted to interest which, in the absence of a waiver of sovereign immunity, cannot be assessed against the United States)).

The bulk of the costs derive from the work of Dr. Axelrod and Dr. Jeret. Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours. Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013). For Dr. Axelrod, Ms. Walton has submitted two invoices reflecting a charge of $3,600 for his first report and $4,200 for his second report. Again, there is no invoice for the third report, the majority of which was copied and pasted from the second report.

The quality of Dr. Axelrod's reports does not merit this much compensation. These reports were terrible. To illustrate the lack of quality, two examples should suffice. In his first report, Dr. Axelrod proposed that molecular mimicry could connect the vaccination to Ms. Walton's fibromyalgia that developed within 24 hours. Yet, in his second report, Dr. Axelrod agreed with the Secretary's experts that an adaptive immune response takes longer than 24 hours. In addition, in his first report, Dr. Axelrod proposed an autoimmune etiology for fibromyalgia yet in his second report, Dr. Axelrod agreed that fibromyalgia has not been shown to have an autoimmune basis. It bears emphasis that the deficiencies in Dr. Axelrod's reports are not simply because the Secretary's experts disagreed with his opinions. Dr. Axelrod's own reports are internally inconsistent and incoherent.

An expert's compensation may be reduced due to poor performance. Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137, 146 (2019); Murray v. Sec'y of Health & Hum. Servs., No. 19-1976V, 2023 WL 9503422, at *2-3 (Fed. Cl. Spec. Mstr. Dec. 22, 2023) (reducing expert's rate from $500 per hour to $100 per hour). Under the circumstances of this case, Ms. Walton will be awarded $3,000.00 for Dr. Axelrod's work in this case. Awarding $3,000.00 actually *overstates* the value of these reports as they did so little to advance Ms. Walton's case that they could be considered valueless.

Compared with Dr. Axelrod, Dr. Jeret's one report is better. It appears that Dr. Jeret's primary task was to evaluate whether Ms. Walton could be diagnosed with small fiber neuropathy. His opinion for this neurological diagnosis is, at least, credible. However, remaining portions of his report, including his opinion that the onset could occur within 24 hours is not persuasive and seems to be outside of Dr. Jeret's field of expertise.

Moreover, another problem is that Ms. Walton has not presented an invoice explaining how Dr. Jeret spent his time. Without this information, it cannot be easily determined that the amount of time Dr. Jeret spent was reasonable. This lack of evidence is more noticeable because the Secretary identified this information as missing and Ms. Walton did not supply it. To account for these problems, Ms. Walton will be awarded half ($2,500) of the amount requested for Dr. Jeret's work.

Accordingly, a reasonable amount of attorneys' costs is $5,951.50.

## IV. Conclusion

Petitioner is awarded $49,440.90, consisting of $43,489.40 in attorneys' fees and $5,951.50 in attorneys' costs. The amount of $$49,440.90 shall be paid through an ACH deposit

to Mr. Sadaka's IOLTA account for prompt disbursement. In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[6]

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.